UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Board of Trustees of the Iron Workers Local 17 Pension Fund, | ) ) ) | Case No. 1: 14 CV 533 |
| Plaintiff, | ) ) | JUDGE DONALD C. NUGENT |
| vs. | ) ) | MEMORANDUM OPINION |
| Harris Davis Rebar LLC, et al., | ) ) | |
| Defendants. | ) | |

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Claims
pursuant to Fed. R. Civ. P. 12(b)(6). (ECF #6). For the reasons that follow, Defendants' Motion
to Dismiss is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Board of Trustees of the Iron Workers Local 17 Pension Fund ("Pension
Fund"), brings this action against Defendants Harris Davis Rebar LLC ("Harris Davis") and
Davis JD Steel LLC ("JD Steel") seeking alleged unpaid contributions to the Pension Fund plus
interest, penalties and liquidated damages.

Defendant JD Steel is a limited liability company formed in the State of Delaware in
December 2005, and has its principal place of business in Phoenix, Arizona. (Complaint, ¶ 2) It
is an employer as defined by ERISA engaged in the construction business. *Id.*  JD Steel entered
into a written agreement (the 'International Agreement") with the International Association of
Bridge, Structural, Ornamental and Reinforcing Iron Workers ("Iron Workers International") on
June 6, 2006, in which it agreed to pay union scale wages and benefits in effect in the Local
Union where it did work. (Complaint, ¶¶18-19, Exh. B, Section 6(A)) JD Steel began working in

May 2009 in the territorial area of Iron Workers 17 and began paying contributions to the Pension Fund at the rate established under the 2009-2013 Local 17 collective bargaining agreement ("CBA") and as mandated by the Pension Protection Act Rehabilitation Plan. (Complaint, ¶20). JD Steel changed its LLC name to FKADJDS LLC in November 2012, and continues to engage in business under the changed name, including working in the territorial jurisdiction of Local 17 through September 2013, performing work on the Fairview Hospital parking garage in Cleveland, Ohio. (Complaint, ¶¶20-22) There is no allegation in the Complaint that JD Steel failed to make any pension contributions to the Local 17 Pension Fund for any of its employees on any job in the Local 17 territory.

Defendant Harris Davis is a limited liability company which was formed in the State of Delaware in October 2012, and has its principal place of business in Bellevue, Nebraska. (Complaint, ¶2) It is an employer as defined by ERISA engaged in the construction business. *Id*. Harris Davis entered into the National Reinforcing Steel Agreement ("Rebar Agreement") with the Iron Workers International in March 2013. (Complaint, ¶24, Ex. C)[1] The Rebar Agreement mirrors the terms of the International Agreement executed by JD Steel except the Rebar Agreement carved out an exception for contributions to the Pension Fund and other defined benefit retirement plans. Under the Rebar Agreement, the contributions that Harris Davis would otherwise be required to pay to a Local Union's defined benefit Pension Fund must be diverted to a standalone or Local Union sponsored annuity fund that does not subject Harris Davis to withdrawal liability under Title IV of ERISA. (Complaint, ¶25, Ex. C Section 6(A))

After signing the Rebar Agreement in March of 2013, Harris Davis began working in the

---

[1]The Complaint refers to the Rebar Agreement as "NRSA." (Complaint, ¶24.)

2

territorial area of Iron Workers Local 17 in June at the University Hospital parking garage in Cleveland, Ohio using Local 17 Ironworkers. (Complaint, ¶29) Harris Davis made pension contributions for all hours worked by each employee on the project in accordance with the Rebar Agreement. Harris Davis did not pay contributions to the Local 17 Pension Fund, despite demands by the trustees. (Complaint, ¶29).

The Complaint alleges that while working at University Hospital, Harris Davis employees used equipment and vehicles with the JD Steel name and logo, that both companies employed the same supervisors and foreman and employed the same Iron workers interchangeably while working on the University and Fairview Hospital jobs. (Complaint, ¶30-32)

Based upon these allegations, Plaintiff asserts that JD Steel and Harris Davis are alter egos and that Harris Davis was created for the unlawful purpose of attempting to avoid JD Steel's obligations to pay contributions to the Pension Fund and to avoid actual or potential withdrawal liability making both companies jointly obligated to pay contributions to the Pension Fund based upon hours worked by and paid to Iron Workers employed by either entity when performing work within the territorial area of Local 17. (Complaint, ¶34-37)

Plaintiff also alleges that even if Harris Davis is not an alter ego of JD Steel, it is liable for contributions to the Pension Fund under the terms of the Rebar Agreement because the carve-out contained in Section 6 of the Rebar Agreement for pension contributions conflicts with the Pension Protection Act.  As such, the carve-out should be suspended pursuant to Section 11 of the Rebar Agreement which provides that "any provision of the Agreement which is in conflict with any national, state or local law or governmental regulation affecting all or part of the territorial limits covered by this Agreement shall be suspended in operation within the territorial

3

limits to which such law or regulation is applicable for the period during which such law or

regulation is in effect." (Complaint, ¶¶42-45, Ex. C) Once Section 6 of the Rebar Agreement is

suspended in the Local 17 territory because of the conflict the Pension Protection Act, Harris

Davis is no longer exempt from its obligation to pay contributions to the Pension Fund and is in

default for failing to pay contributions to the Pension Fund in an amount not less than $140,000,

plus 10% delinquency assessments and interest. (Complaint, ¶¶46-48)

Defendants have moved to Dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6).

That motion is now fully briefed and ready for decision.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) allows a defendant to

test the legal sufficiency of a complaint without being subject to discovery.  *See Yuhasz v. Brush*

*Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).  In evaluating a motion to dismiss, the court

must construe the complaint in the light most favorable to the plaintiff, accept its factual

allegations as true, and draw reasonable inferences in favor of the plaintiff.  *See Directv, Inc. v.*

*Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  However, "the tenet that a court must accept a

complaint's allegations as true is inapplicable to threadbare recitations of a cause of action's

elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S.Ct. 1937,1940

(2009). *See also Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000) (court will not

accept conclusions of law or unwarranted inferences cast in the form of factual allegations.)

In order to survive a motion to dismiss, a complaint must provide the grounds of the entitlement

to relief, which requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That

4

is,"[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (internal citation omitted); *see Association of Cleveland Fire Fighters v. City of Cleveland*, No. 06-3823, 2007 WL 2768285, at *2 (6th Cir. Sept. 25, 2007) (recognizing that the Supreme Court "disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed.2d 80 (1957)").  Accordingly, the claims set forth in a complaint must be plausible, rather than conceivable.  *See Twombly*, 550 U.S. at 570.

On a motion brought under Rule 12(b)(6), the court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account.  *See Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008)*; Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).

### DISCUSSION

Addressing Plaintiff's claims in reverse order, Defendants argue that neither the Pension Protection Act nor ERISA can create a nonexistent obligation for Harris Davis.  Because there is no contractual obligation, under either ERISA or the Pension Protection Act, for the Local 17 Pension Fund to ask the Court to enforce, Defendants assert that this claim should be dismissed for failure to state a claim upon which relief may be granted.

Defendants do not dispute that the Pension Protection Act applies to the Local 17 Pension Fund or that the Act requires employers bound to the terms and provisions of the Local 17 labor agreement to make contributions to the Pension Fund pursuant to the updated Rehabilitation Plan. However, Defendants assert that neither the Pension Protection Act nor ERISA prevents an

employer and the International Union from entering an agreement, like the Rebar Agreement here, to pay wages and benefits in accordance with a local union's schedule, but to direct the pension contributions to a vehicle that does not subject them to withdrawal liability.  Further, Defendants contend that nothing on the face of the Pension Protection Act, nor in its implementation, creates an obligation for employers not already subject to an obligation to contribute to a multiemployer pension fund.  Harris Davis notes that it is not "*bound*" to the terms and provisions of the Local 17 labor agreement to make contributions to the Pension Fund because under the Rebar Agreement with the International Union, it agrees to "*conform* to the terms and conditions of employment" as amended by section 6(A) of the Rebar Agreement and because Harris Davis is not, and never has been, a "bargaining party" to the Local 17 labor agreement.

The Trustees contend that the Rebar Agreement binds Harris Davis to the terms of the Local 17 labor agreement but unlawfully exempts Harris Davis from contributing to the Pension Fund. Harris Davis contends that the terms of the Rebar Agreement do not "bind" Harris Davis to the Local 17 labor agreement, but rather implements a pension payment plan that "conforms with" the payment rates provided in the terms and conditions of any agreement between a local union and employers paying for covered work, provided such plan is not subject to the provisions of Title IV of ERISA.  The question is whether by incorporating the requirement to pay wages and benefits in accordance with a local union's payment schedule, the Rebar Agreement "binds" the  employer to the entirety of the local labor agreement, including the requirement to make pension contributions to the Local 17 Pension Fund?  Review of the Rebar Agreement attached to the Complaint demonstrates that it did not intend to "bind" Harris Davis to all the terms of the

Local 17 labor agreement. The terms of the Rebar Agreement regarding the treatment of pension contributions are clear and reflect the intent of the parties that all pension contributions will be made solely to a standalone contribution plan, not subject to Title IV, the withdrawal liability provisions, of ERISA. (ECF #1, Ex. C §§ 6(A)(1), 6(A)(2), 6(E), 6(F), 7)

Having found that the Rebar Agreement does not "bind" Harris Davis to the Local 17 labor agreement such that it is obligated to make pension contributions to the Local 17 Pension Fund, the final question is whether Section 6 of the Rebar Agreement is unlawful and thus unenforceable. The Trustees explain that the actuary for the Pension Fund certified to the Trustees on July 29, 2008 that the Pension Fund was in critical status as defined by 29 U.S.C. § 1085(b)(2) and that the Trustees and the actuary in creating a rehabilitation plan as required by the PPA made a thorough review of the current collective bargaining agreements. At the time of that review, the Local 17 labor agreement and the International Agreement required all employers to contribute to the Pension Fund when performing iron work under the craft jurisdiction of the Iron Workers International within Local 17's territorial area. These contributions were relied upon by the Trustees and the actuary in establishing the Pension Fund's rehabilitation plan. Now, the Trustees argue that the Rebar Agreement serves to intentionally divert the very contributions that were used to establish the Pension Fund's rehabilitation plan and gives Harris Davis the ability to divert critical contribution income from the Pension Fund where no other contributing employer has the ability to do the same.

The Trustees also argue that the Rebar Agreement is contrary to the intent of the legislature when the funding reforms were adopted in 2006 which recognized the need to give plan trustees additional authority to restructure and revitalize seriously troubled plans. In this

7

vein the PPA granted trustees the ability to set revised benefit or contribution structures to enable the pension plans to emerge from critical status.  In the event the bargaining parties did not negotiate one of the schedules provided, the trustees were given the authority to unilaterally require contributions through the imposition of a default schedule.  The Trustees note that had Harris Davis been a part of the negotiations that took place, it would have been subject to negotiate one of the required schedules.  Moreover, if Harris Davis had approached Iron Workers 17 to negotiate its own separate agreement, then the  contribution and benefit revision terms set forth in the rehabilitation plan would have been part of the negotiations.  Thus, the Trustees conclude that allowing Harris Davis to circumvent paying contributions to the Pension Fund as set forth in the rehabilitation plan and divert those payments to a standalone plan undermines the purpose and efficacy of the PPA, damages the liabilities and benefits of the Pension Fund and its participants and beneficiaries, and provides Harris Davis with an unfair advantage over other employers who employ Iron Workers 17 members.

What the Trustees' recitation makes clear is that Harris Davis was not a bargaining party in the underlying labor agreements and had no obligation at any time to contribute to the Pension Fund.  There is no evidence that the Pension Protection Act creates an obligation for employers not already subject to an obligation to contribute to a multiemployer pension fund.  The Trustees have failed to provide the Court with any law or provision of ERISA or the PPA that makes an agreement such as Section 6 of the Rebar Agreement negotiated between the International Union and an employer who was not a bargaining party and was never obligated to contribute to a multiemployer pension fund, unlawful and thus unenforceable.  As such Count Two of the Complaint is dismissed for failure to state a claim upon which relief may be granted.

8

Moving on to Count One of the Complaint, the Trustees allege that JD Steel is an employer who is obligated to make contributions to the Pension Fund pursuant to the International Agreement it entered with the International Union which binds JD Steel to the provisions of the Local 17 CBA when it employs iron workers performing covered work in Local 17's territorial area, including the obligation to contribute to the Pension Fund. (ECF #1, ¶¶ 8-9, 19) The Trustees further allege that Harris Davis is also bound to the International Agreement, and therefore obligated to contribute to the Pension Fund because Harris Davis is an alter ego of JD Steel. (ECF #1, ¶¶ 32-40).

Defendants move to dismiss this count on the ground that the alter ego doctrine is inapplicable as a matter of law under the facts as set forth by Plaintiff in this Complaint.  The alter ego doctrine is based upon equitable principles and was "'developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form.' *Allcoast Transfer*, 780 F.2d at 579. The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer." *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Industrial Contracting, LLC*, 581 F.3d 313, 317-18 (6th Cir. 2009). The Sixth Circuit applies the alter ego doctrine in two factual contexts– a "disguised continuance" or a "double breasted" operation.  In a "disguised continuance" situation, the alter ego doctrine may be used to bind a new employer that continues the operations of an old employer. *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990).  Similarly, the doctrine is also applied to "double breasted" operations where "two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id*.  The *Fullerton* Court further noted that double breasted operations arise "where a

9

company operating with a unionized work force establishes a second, nonunionized company performing the same work in the same market under the same control." *Id*. at 336 n.7. The test to determine whether companies are alter egos is the same in both situations: "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id*. at 336.

The disguised continuance situation is not applicable here as JD Steel continued to operate in the Local 17 territory after Harris Davis began working in the same territory. Moving on to whether this is a "double breasted" situation that should be subject to the application of the alter ego doctrine, Defendants argue that the Court must determine the threshold question of whether the arrangement under dispute actually is a "double-breasted" operation before considering the multi-factor test. In this case, Defendants argue that it is unnecessary to determine whether the two companies have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership because there is no "double breasting" as defined by *Fullerton* – a unionized workforce followed by a second nonunionized company performing the same work in the same market under the same control. Plaintiff disagrees, asserting that the facts alleged in this case demonstrate a "classic" double breasted operation where "a company with certain labor obligations creates a second company with no such labor obligations, to perform the same work in the same market." (ECF #8 at 9.) However, even assuming that JD Steel created Harris Davis, the facts alleged in the Complaint show that both JD Steel and Harris Davis operate union shops pursuant to labor agreements and that both have (and meet) obligations under those contracts, including making identical contributions to pension funds. The only difference between the labor obligations of the two

10

companies, at least as noted in the Complaint, is the fund in which the companies deposit the

pension contributions for their workers. While Harris Davis has avoided the possibility of

withdrawal liability as a function of its Rebar Agreement with the International Union, it has not

avoided labor obligations and continues to operate as a union shop with union labor with the

same worker pay, benefits and conditions of employment as set forth in the Local 17 CBA.  JD

Steel and Harris Davis are two union employers meeting separate labor obligations.  As such, this

is not be a factual context in which the alter ego doctrine should be applied.

## CONCLUSION

For the reasons set forth above, Defendants Joint Motion to Dismiss Plaintiff's Claims

(ECF #6) is granted.

IT IS SO ORDERED.


 _/s/Donald C. Nugent_____
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED:_ September 25, 2014___

11